# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

HEATHER M. JUDY,    :

  Plaintiff,    :

             Case No. 3:13cv00257

 vs.        :

             District Judge Walter Herbert Rice

CAROLYN COLVIN,    :  Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,   :

  Defendant.    :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I. Introduction

Plaintiff Heather M. Judy alleges that she suffers from severe and functionally

debilitating mental-health issues.  Her medical records have described these issues, at

various times, as social phobia with agoraphobia, anxiety, depression, bipolar disorder,

and mood disorder.  She alleges that her symptoms have been with her most of her adult

life.  Several telltale events appear to reflect this:  She did not graduate from high school;

she could not tolerate being in public long enough to take the classes necessary for her to

earn a GED; and she has struggled to maintain employment – her most recent job at a

McDonald's restaurant lasted only 18 months.  Her medical records indicate, to her credit,

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

that although she has struggled over the years with mental-health issues, she has sought treatment and is motivated to get better.  *E.g,* Doc. #6, PageID at 418.

On January 25, 2010, Plaintiff filed for Disability Insurance Benefits and Supplemental Security Income.  She asserted that her mental-health impairments precluded her from maintaining a full-time job, beginning on August 1, 2008. This, in her view, meant that she was under a "disability" within the meaning of the Social Security Act and was therefore eligible to receive benefits.  The Social Security Administration disagreed and denied her applications.

The denial was based mainly on the decision of Administrative Law Judge Irma J. Flottman who rejected the information and opinions from Plaintiff's treating psychiatrists, credited two non-treating psychologists, and declined to fully accept Plaintiff's description of her mental-health problems.

Plaintiff brings the present case challenging ALJ Flottman's non-disability decision.  The case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #13), the administrative record (Doc. #8), and the record as a whole.

This Court has jurisdiction to review ALJ Flottman's decision.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

## II.    Plaintiff's Background and Testimony

Plaintiff was 31 years old on the date she asserts her disability began.  This placed

2

her in the category of a "younger person" for the purpose of resolving her applications for benefits. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c).[2] She has a limited education. Her past work in the fast-food industry was "unskilled," under Social Security lexicon. *See* 20 C.F.R. §404.1568(a).

During ALJ Flottman's administrative hearing, Plaintiff testified that her health problems consist mainly of anxiety and depression. She described her anxiety as " like a social anxiety," adding:

> I've missed so many doctors' appointments because it's like I won't take myself to the doctor because I don't like being around people in general. I only go out of the house if I absolutely necessarily have to, like, you know, to get my kids to the doctors or to the dentists, and that's about basically the only place I go.

(Doc. #8, PageID at 79). Anxiety causes her to start gagging like she is going to vomit. She sweats "real bad," turns pale white, and gets "the shakes." It feels to her like she is "about to pass out." *Id*. The feeling typically lasts until she arrives home. She does not engage in activities outside her home with her children because she feels like "all eyes [are] on her," referring to neighbors that might be sitting outside watching her. *Id*., PageID at 80.

Plaintiff testified that she left high school when she started to have a panic attack and a teacher would not let her take her prescription medication (Klonopin). *Id.*, PageID at 83. Plaintiff reasoned that she could not remain in school if she was not allowed to take her

---

[2] The remaining citations focus on the Regulations applicable to Disability Insurance Benefits. The citations incorporate the corresponding Supplemental Security Insurance Regulations without separately identifying them.

medication to help her make it through the school day.  She attempted to earn a GED but "just couldn't be around a lot of people that [were] in the room."  *Id.*, PageID at 77.  Also, they would not allow her to take the required GED "and take [her] medications."  *Id*.  She testified, "So with the nervous problem, I just, I couldn't stand to go."  *Id.*

Plaintiff testified that she lives with her three children and her parents.  Her longest time of employment was when she worked at a McDonald's restaurant as a cook "in the back on the grill" where there were "not very many people."  (Doc. #8, PageID at 78).  She left that job when her boss started yelling at her "in front of all the other crew and customers."  *Id.*  She explained, "I've had nervous breakdowns there before where [I] went in the back and just sat down and cried.  And he jumped on me, and I just grabbed my stuff and got in my car and went home."  (Doc. #8, PageID at 78).  She had previously experienced panic attacks while working at McDonald's.  *Id.*, PageID at 90.  She described those incidents as follows:

> There would be times ... with the depression, I would, you know, start having a panic attack, I would go back where they wash dishes ... and I would sit on the floor and literally cry....  And they'd have to send me home because I just, I couldn't go throughout the day with the issues I was going through.

*Id*.  In addition to breaks and lunch, Plaintiff needed a break from working two or three times per day in order to recompose and calm herself.  *Id.*, PageID at 90-91.

Upon the advice of a physician, Plaintiff has attempted to try to ease her anxiety when she leaves home.  Starting from her front porch, she has tried to work her way farther from her house.  She is able to go into her backyard because it is enclosed, but it "bothers

[her] to be out there" so she only remains for two or three minutes at a time.  *Id*., PageID at 84.  She also has mood swings.  She explained that she will start to become "really nervous," then her "mood just flips" from feeling "okay" to wanting people to "just get away from [her] and leave [her] alone."  *Id*.

Plaintiff goes through periods when she sleeps a lot and other periods when she does not sleep very much.  *Id*., PageID at 94.  On weekdays, her daily routine begins when she gets up early to help her kids get ready for school.  She usually returns to sleep after their bus comes and they leave for school.

After napping until about 10:30 a.m., she moves to the couch "and that's where [she] basically stay[s]."  (Doc. #8, PageID at 85).  She watches whatever her stepfather is watching on television, but she cannot follow a storyline for more than ten minutes.  She does not prepare meals for herself or her children; her stepfather does the cooking.  She does not go shopping due to panic attacks.  A niece does the shopping for her.  In the past, when she would occasionally go shopping, she always had someone with her.  *Id*., PageID at 93.  She does not mow the lawn; her stepfather or brother does that.  If she gets enough energy, she sometimes – once or twice a week – sweeps the living room floor.  She had a driver's license in the past but allowed it to expire.  (Doc. #8, PageID at 77, 83, 85-86).  She reasoned that it was pointless to have a driver's license when she does not go anywhere.  She added, "And with me going in there and trying to take my driver's test with a lot of people in there, I just gave ... up."  *Id*., PageID at 89.

5

When asked if she had any hobbies, Plaintiff answered, "I did in the past."  *Id*.,

PageID at 86.  She identified her past hobbies as fishing, bowling, going to the movies, and

doing active things with her children when they were younger.  *Id*., PageID at 86.  She does

not see friends on a regular basis.  Once or twice a month she sees family members other

than those she lives with.  She does not spend time reading due to her difficulty

concentrating.

Plaintiff testified that she made several brief and unsuccessful attempts to work.  She

attempted jobs with Goodwill and a temporary agency, working third shift on an assembly

line.  *Id*., PageID at 92-93.  She briefly worked as a hotel hostess and as a hotel room

server.  She quit these jobs because she was "having panic attacks."  *Id*.

## III.   <u>Medical Source Opinions</u>

Reviewing the medical source opinions in chronological order, clinical psychologist

Dr. Bonds was the first to consider Plaintiff's mental work limitations.  In July 2010, Dr.

Bonds examined and evaluated Plaintiff at the request of the Ohio Bureau of Disability

Determinations.  He also reviewed records of Plaintiff's mental-health treatment at

Advanced Therapeutics.

Dr. Bonds diagnosed Plaintiff with Panic Disorder without Agoraphobia and

Dysthymic Disorder.  He assessed her GAF at 50,[3] indicating a person with "serious

---

[3]  At the time of the ALJ's decision, health care professionals used the "GAF" (Global
Assessment of Functioning) scale to assess a person's psychological, social, and occupational
functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's

symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job) ....” <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed., Text Revision (DSM-IV-TR) at p. 34.  Dr. Bonds opined that Plaintiff is moderately impaired in her ability to relate to peers, supervisors, or the public; her mental ability to understand, remember, and follow instructions is not impaired; her ability to maintain attention, concentration, persistence, and pace to perform simple tasks is not impaired; and her ability to withstand the stress and pressure associated with day to day work activities is moderately impaired. (Doc. #8, PageID at 314).

In August 2010, psychologist Dr. Kravitz reviewed the record at the request of the Ohio Bureau of Disability Determinations.  He recognized that Plaintiff had a panic disorder without agoraphobia and a mood disorder.  *Id*., PageID at 322-23.  He opined that Plaintiff had mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and had not experienced repeated episodes of decompensation of extended duration.  *Id*., PageID at 327.  He found Plaintiff to be partially credible, noting, “[m]ental status is mostly intact with claimant retaining functional abilities in many areas of daily functioning.  Both indicate a lesser degree of severity than would be predicted based on claimant’s allegations of depression.” *Id*., PageID at 329.

---

“overall psychological functioning” at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); <u>Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision</u> at 32-34.

Dr. Kravitz also assessed Plaintiff's specific mental-work abilities by checking boxes on a form.  Rather than finding Plaintiff markedly limited, Dr. Kravitz opined that Plaintiff was either not significantly limited or moderately limited in each ability.  *Id*., PageID at 330-32.

In February 2011, psychologist Dr. Rivera reviewed the record and "affirmed" Dr. Kravitz's August 2010 assessment.  *Id*., PageID at 333.

Plaintiff's treating psychiatrist at Advanced Therapeutics, Dr. Gollamudi, completed a questionnaire in March 2011.  (Doc. #8, PageID at 334-40).  Dr. Gollamudi reported that he began seeing Plaintiff on August 9, 2008 and had last seen her on January 28, 2011.  He described Plaintiff's mental status as anxious and diagnosed her with Bipolar, Mood, and Anxiety Disorders, each NOS (not otherwise specified in the DSM-IV-TR).  He noted that Plaintiff's treatment included medications – Wellbutrin, Xanax, and two others.  *Id*., PageID at 337.  In response to the question, "How would the patient react to the pressures, in a work setting or elsewhere, involved in simple and routine, or repetitive tasks," Dr. Gollamudi opined that Plaintiff was "not able to work in pressure, due to mood swings [and] anxiety."  *Id*., PageID at 337.

In November 2011, Plaintiff's most recent treating psychiatrist, Dr. Ballerene, reported to Ohio Job & Family Service that Plaintiff's mood was "depressing"; her affect was congruent and appropriate; her thought process was linear, logical, and goal-directed; she had no suicidal or homicidal thoughts and no hallucinations; but she was "anxious that

people may want to break in or hurt her[.]" *Id*., PageID at 428.  Dr. Ballerene also assessed

Plaintiff's specific mental-work abilities by checking boxes on a form.  She indicated that

Plaintiff was markedly limited in her ability to perform the following: maintain attention or

concentration for extended periods; work in coordination with or proximity to others

without being distracted by them; work with the general public; get along with coworkers or

peers without distracting them or exhibiting behavioral extremes; travel in unfamiliar places

or use public transportation; or complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable number and length of breaks.  (Doc. #8, PageID at 425).

Dr. Ballerene noted on the form that her specialty is psychiatry, and she checked a

box indicating that, in her opinion, Plaintiff was "unemployable" for 12 months or more.

*Id*.


IV.     **"Disability" Defined and The ALJ's Decision**

To be eligible for Disability Insurance Benefits (DIB) or Supplemental Security

Income (SSI) a claimant must be under a "disability" within the definition of the Social

Security Act.  *See* 42 U.S.C. §§423(a), (d), 1382c(a).  The Social Security Act defines the

term "disability" in essentially the same way for both DIB and SSI.  *See Bowen v. City of*

*New York*, 476 U.S. 467, 469-70 (1986).  A "disability" consists only of physical or mental

impairments that are both "medically determinable" and severe enough to prevent the

applicant from (1) performing his or her past job and (2) engaging in "substantial gainful

activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

To determine whether Plaintiff was under a disability, and thus eligible for DIB or SSI, ALJ Flottman considered the evidence under the five Steps of the Social Security Administration's sequential-evaluation procedure.  20 C.F.R. §§ 404.1520(a)(4); *see Ealy v. Comm'r of Social Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  At the first several Steps, ALJ Flottman concluded:  (1) Plaintiff had not engaged in substantial gainful activity after her claimed disability onset date (August 1, 2008); (2) she has the severe impairments of mood disorder, dysthymic disorder, depressive disorder (not otherwise specified in the Diagnostic and Statistical Manual of Mental Disorders); and (3) her impairments did not meet or equal the criteria of an impairment in the Listings.[4]  (Doc. #8, PageID at 60-62).

At Step four of the sequential evaluation, ALJ Flottman found that Plaintiff had the physical ability – the Residual Functional Capacity[5] – to perform all levels of exertional work.  The ALJ further determined that Plaintiff's mental Residual Functional Capacity consisted of "work limited to simple, routine, and repetitive tasks; only occasional changes in work setting; work with no production rate or pace work; no interaction with the public; only occasional interaction with coworkers; no teamwork; work can be around coworkers

---

[4] The Social Security Administration's  Listing of Impairments is found at 20 C.F.R. Part 404, Subpart P, Appendix 1.

[5] "Residual Functional Capacity" is administrative lexicon referring to "the most a person can do" considering his or her existing physical and mental limitations. *See* 20 C.F.R. § 416.945(a); *see also* Social Security Ruling 96–8p, 1996WL 374184.

throughout the day, but with only occasional interaction with coworkers."  (Doc. #8, PageID at 62-63).  The ALJ then concluded that Plaintiff could not perform her past relevant work as a fast-food worker.  *Id.*, PageID at 65.  The ALJ noted that Plaintiff had a limited education and was age 31, a "younger individual," on her claimed disability onset date.  *Id.*

At Step 5, the ALJ concluded that in light of Plaintiff's Residual Functional Capacity, age, education, and work experience, she could perform a significant number of jobs that existed in the regional and national economies.  Consequently, she was not under a disability and not eligible to receive DIB or SSI.  *Id.*, PageID at 65-66.

## V.    <u>Judicial Review</u>

The Social Security Administration's non-disability determinations – typically embodied in an ALJ's written decision – are subject to review in this Court along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r. of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).  Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains

evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486

F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social Sec.*, 203 F.3d 388, 389-90 (6th

Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence

standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as

adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r

of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of

"more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at

241.

## VI.   **Discussion**

Plaintiff contends that the ALJ failed to weigh the medical source opinions as the

Regulations require and likewise failed to place controlling weight on her treating

psychiatrist Dr. Ballemere's opinions as was due under the treating physician rule. Plaintiff

also maintains that Dr. Ballemere's opinions are at least entitled to deferential weight, and

the ALJ erred by crediting the opinions of nontreating medical sources, Drs. Bonds and

Kravitz.

The Commissioner maintains that substantial evidence supports the ALJ's decision,

and the ALJ "adequately evaluated the opinion evidence." (Doc. #13, PageID at

521)(capitalization omitted). The Commissioner argues that the ALJ reasonably afforded

no significant weight to Dr. Ballerene's opinions and offered the requisite "good reasons"

for doing so. The Commissioner further argues that the ALJ properly discussed and

weighed the opinions provided by Drs. Bonds, Kravitz, and Rivera, noting that they were

consistent with the record as a whole.

### A.  Medical Source Opinions

Social security regulations recognize several different types of medical sources:

treating physicians and psychologist, nontreating yet examining physicians and

psychologist, and nontreating/record-reviewing physicians and psychologists.  *Gayheart v.*

*Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has
> examined a claimant is given more weight than that from a source who has
> not performed an examination (a "nonexamining source"), and an opinion
> from a medical source who regularly treats the claimant (a "treating source")
> is afforded more weight than that from a source who has examined the
> claimant but does not have an ongoing treatment relationship (a "nontreating
> source"). In other words, "[t]he regulations provide progressively more
> rigorous tests for weighing opinions as the ties between the source of the
> opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996
> WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing, in part, 20 C.F.R. §§ 404.1527(c)(1) and (2) (eff. April 1,

2012)).[6]  To effect this hierarchy, the Regulations include the treating physician rule.  *See*

*Gayheart*, 710 F.3d at 375; *see also Rogers*, 486 F.3d at 242; *cf. Bauer v. Astrue*, 532 F.3d

606, 608 (7th Cir. 2008) ("in fact the technical name for the 'treating physician' rule is the

'treating source' rule").  The rule is straightforward:

---

[6] The Social Security Administration has relettered 20 C.F.R. §404.1527 without altering the treating physician rule or other legal standards. *See Gentry v. Comm'r of Social Sec.*, 741 F.3d 708, 723 (6th Cir. 2013).  The relettered version applies to decisions, like ALJ Flottman's decision, issued on or after April 1, 2012.

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with other substantial evidence in [a claimant's] case record."

*Gayheart*, 710 F.3d  at 376 (quoting 20 C.F.R. §404.1527(c)(2)); *see Gentry v. Comm'r of Social Sec.*, 741 F.3d 708, 723 (6th Cir. 2014).  If both conditions do not exist, the ALJ's review must continue:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Rogers*, 486 F.3d at 242 (citing *Wilson v. Comm'r of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

The Regulations also require ALJs to "always give good reasons ... for the weight [they] give your [a claimant's] treating source's opinion." 20 C.F.R. §404.1527(c)(2). Social Security Ruling 96-2p, 1996 WL 374188 (July 2, 1996) echoes this mandate and further explains that an ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in ths case record, and must be sufficiently specific to make clear to any subsequent reviews the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*., 1996 WL at *5.  The good-reasons requirement is "a mandatory procedural protection ...." *Wilson*, 378 F.3d at 546.

### B.    Discussion

ALJ Flottman rejected Dr. Ballerene's opinions for "lack of support":

> Dr. Ellen Ballerene opined that the claimant was unemployable in a report for Ohio Job & Family Services giving the claimant multiple 'marked' limitations (Exhibit 11F).  However there is no support for such severe limitations.  The claimant is capable of many activities as described in her activities of daily living.  Her GAF scores are consistently 50 or higher when she is taking her medications.  She is motivated to get better.  Mental status exams have shown normal results (Exhibit 12F, page 51 [PageID at 479]).  Furthermore, she is able to go out, shop, bowl, and fish.  Therefore, due to the lack of support for Dr. Ballerene's opinion of disability, no significant weight will be due.

(Doc. #6, PageID at 64).

The ALJ erred by rejecting Dr. Ballerene's opinions based solely on the purported lack of supporting evidence.  The ALJ did not mention the treating physician rule or otherwise indicate that she first considered whether Dr. Ballerene's opinions was due controlling weight under the legal criteria applicable to the treating physician rule. Assuming, in the Commissioner's favor, that the ALJ sufficiently applied the treating physician rule by pointing only to the lack of supporting evidence, the ALJ did not continue her evaluation of Dr. Ballerene's opinions under the remaining factors as the Regulations require.  *See* 20 C.F.R. §404.1527(c); *see also* Social Sec. Ruling 96-2p, 1996 WL 374188 at *3-*4 (July 2, 1996); *Gayheart*, 710 F.3d at 375-76.  This was contrary to the two-step analysis that ALJs must conduct by first considering the treating physician rule and second considering the remaining regulatory factors.  *See Rogers*, 486 F.3d at 242 ("[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician

is entitled to great deference, its non-controlling status nothwithstanding.")  The ALJ's focus on the lack of supporting evidence to the exclusion of the other possible factors also failed to provide "good reasons" for rejecting Dr. Ballerene's opinions.  The Regulations require ALJs to "always give good reasons ... for the weight [they] give [a claimant's] treating source's opinion."  20 C.F.R. §404.1527(c)(2); *Wilson*, 378 F.3d at 546 (identifying the "good reasons" requirement as "a mandatory procedural protection ....").  These reasons "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at *5 (July 2, 1996). The good-reasons requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJs application of the rule."  *Gayheart*, 710 F.3d at 376 (quoting, in part, *Wilson*, 378 F.3d at 544).  Because the ALJ's reasons for rejecting Dr. Ballerene's opinions were not specific enough to ensure that she applied the treating-physician rule or the two-step weighing process, her decision fails to satisfy the good-reasons requirement.

In addition, substantial evidence does not support the ALJ's conclusion that the record lacks evidence supporting Dr. Ballerene's opinions.  The fact that Plaintiff is motivated to get better is not probative of her mental-work abilities and limitations and does not conflict with Dr. Ballerene's opinions.  Her motivation merely provides some reason for optimism about her potential recovery from her mental-health problems without indicating

16

that she has sufficiently recovered to perform any significant mental-work activities or to perform a full-time job.

The ALJ's reference to Plaintiff's daily activities without more is too general to be meaningful or to conflict with Dr. Ballerene's opinions. Perhaps the ALJ is referring to Plaintiff's testimony about her daily activities. Probably not because Plaintiff's testimony confirms Dr. Ballerene's opinion about her marked level of restrictions. Similarly, the minimal daily activities Plaintiff described to Dr. Bonds – helping her children get ready for school, straightening the house, watching TV, cooking – do not conflict with Dr. Ballerene's opinions because the activities were neither so complex nor sustained to equate with the mental abilities necessary for full-time work. Residual functional capacity "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Social Sec. Ruling 96-8p, 1996 WL 374184 at *1.

The ALJ also cites to Exhibit 12F, page 51 in support of her finding that "[m]ental exams have shown normal results." (Doc. #6, PageID at 64). This vastly overstates or misunderstands the notes provided on this single page of the record. Dr. Ballerene observed that Plaintiff's concentration was "variable" and she was "easily distracted [and] forgetful." *Id*., PageID at 479. Although Dr. Ballerene checked a box indicating that Plaintiff's mental status was "unremarkable," this referred to the "relevant changes in client's [Plaintiff's]

17

condition and mental status." *Id*.  In this context, "unremarkable" is a relative term, describing the lack of improvement or decompensation in Plaintiff's then-existing mental status. *Id*, PageID at 479-80.  It does not indicate "normal results," as the ALJ believed. Also, on this same date, Plaintiff reported to Dr. Ballerene that her "anxiety was still very strong," and it was hard for her to leave her house. *Id*., PageID at 478, and Dr. Ballerene continued to diagnose Plaintiff as having social phobia with agoraphobia. *Id*., PageID at 480.

The ALJ next referred to Plaintiff's ability "to go out, shop, bowl, and fish." *Id*., PageID at 64.  Plaintiff testified, however, that she is no longer able to bowl and fish. *Id*., PageID at 86.  This is consistent with her prior report to the Social Security Administration. When asked to describe any changes to her hobbies of fishing and bowling, she answered "don't go out anymore[,] I have panic attacks around a lot of people." *Id*., PageID at 233.

Lastly, the ALJ rejected Dr. Ballerene's opinions because Plaintiff's GAF scores were 50 or higher when she takes her medication.  Plaintiff acknowledges that the ALJ was correct in presuming that her symptoms were controlled some, and she functioned somewhat better with medication.  But, as Plaintiff correctly argues, this is not the same as concluding that when she takes medications, she has only moderate limitations in her mental-work abilities.  The DSM-IV-TR, page 34, explains that the GAF scale represents "a hypothetical continuum" of psychological, social, and occupational functioning.  The scale ranges from 100 (superior functioning) to 1 (persistent danger of hurting self or other).  The

GAF scale is further broken down into increments of ten.  At each increment (e.g., 70, 60, 50, 40), the severity of symptoms and level of functioning is briefly described.  The GAF scale at 60 describes, "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at p. 34.  The GAF scale at 50 describes, "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR, p. 34.  Given that the GAF scale is a "continuum," a GAF of 52 is much closer to 50 ("serious symptoms") than it is to 60 ("moderate symptoms").  Such low-range symptoms – without additional supporting evidence – does not conflict with Dr. Ballerene's opinion about Plaintiff's marked mental-work limitations.  Additionally, the usefulness of GAF scores is, at present, dubious particularly when compared to the deference generally due a treating medical source's opinions.  *See Rogers*, 486 F.3d at 242.  The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale.  The American Psychiatric Association has explained, "Clinician-researchers ... have conceptualized [the] need for treatment as based on diagnosis, severity of symptoms and diagnosis, dangerousness to self or others, and disability in social and self-care spheres.  We do not believe that a single score from a global assessment, such as the GAF, conveys information to adequately assess each of these components, which are likely to vary over

time."  http://www.dsm5.org ("FAQs About DSM-5 Implementation – For Clinicians").

Citing *Allen v. Comm'r of Social Sec.*, 561 F.3d 646 (6th Cir. 2009), the Commissioner maintains, "the ALJ fulfilled her duty under the law, providing the requisite 'good reasons' for affording less than controlling weight to the opinion of the treater." (citing *Allen*, 561 F.3d at 651).  The ALJ in *Allen* provided a brief – one-sentence rejection – of a treating physician's opinion.  But the ALJ's one-sentence rejection in *Allen* satisfied the good-reasons requirement because "it reache[d] several of the factors that an ALJ must consider when determining what weight to give a non-controlling opinion by a treating source, including: the length of treatment relationship and frequency of examination, the nature and extent of the treatment relationship, and the supportability of the opinion."  561 F.3d at 651 (internal citations omitted).  Unlike *Allen*, the ALJ's decision in the present case stopped at the factor of supportability, rather than referring to other regulatory factors.  And, substantial evidence did not underpin the ALJ's reasons for disregarding Dr. Ballerene's opinion.  *Allen*, therefore, does not assist the Commissioner in overcoming the ALJ's flawed and unsupported weighing of Dr. Ballerene's opinion.

Accordingly, Plaintiff's challenges to the ALJ's rejection of treating psychiatrist Dr. Ballerene's opinion are well taken.

## VII.  <u>Remand is Warranted</u>

If the ALJ failed to apply the correct legal standards or her factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for

rehearing or to reverse and order an award of benefits.  Under Sentence Four of  42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth above.  In addition to the ALJ's missteps when weighing Dr. Ballerene's, those missteps reveal a further problem in the ALJ's decision.  Based on the "consistency" factor, the ALJ accepted the opinions of nontreating medical sources, Drs. Bonds and Kravitz.  (Doc. #6, PageID at 63-64).  But, their nontreating opinions were inconsistent with Dr. Ballerene's opinion, an inconsistency the ALJ avoided by rejecting Dr. Ballerene's opinion.  Due to the ALJ's missteps when weighing Dr. Ballerene's opinions, an unresolved conflict remains in the record between her treating-source opinions versus the opinions of nontreating sources, Drs. Bonds and Kravitz.  On remand the ALJ should be directed to (1) evaluate all medical

source opinions and other evidence of record under the legal criteria set forth in the

Commissioner's Regulations and Rulings and as mandated by case law; and (2) review

Plaintiff's disability claim under the required five-step sequential analysis to determine

anew whether she was under a disability and thus eligible for DIB and SSI.

## IT IS THEREFORE RECOMMENDED THAT:

1.    The Commissioner's non-disability finding be vacated;

2.    No finding be made as to whether Plaintiff Heather Judy was under a
      "disability" within the meaning of the Social Security Act;

3.    This case be remanded to the Commissioner and the Administrative Law
      Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration
      consistent with this Report; and

4.    The case be terminated on the docket of this Court.


April 21, 2014

                                    s/Sharon L. Ovington
                                 Sharon L. Ovington
                            Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).